UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,        No. 2:22-cr-25-002

vs.        Hon. Robert J. Jonker

SAMSON OGOSHI,

        Defendant.

**DEFENDANT'S SENTENCING MEMORANDUM
AND BRIEF IN SUPPORT OF MOTION FOR
DOWNWARD VARIANCE**

I.    Introduction

On September 5, 2024, this Court will sentence defendant Samson Ogoshi, who pled guilty to one count of Conspiracy to Sexually Exploit Minors in violation of 18 U.S.C. § 2251(a)(e).[1] INFORMATION, ECF No. 1, PageID. 3. Samson Ogoshi pled guilty pursuant to a plea agreement on April 10, 2024. The United States Probation determined Samson's total offense level to be 43 and placed him in criminal history category I, resulting in advisory guidelines range of life, however, the offense carries a maximum sentence of 30 years, and therefore the guideline term is 360 months incarceration.[2][3]

---

[1] Conspiracy to Sexually Exploit Minors is punishable by 15 years to 30 years' imprisonment and a $250,000 fine.
[2] Samson Ogoshi had previously objected to the calculation of the guideline for the Chapter 4 Enhancement pursuant to U.S.S.G.§ 4B1.5(b)(1), but withdraws that objection. Counsel has made the Government aware of its withdrawal.
[3] Counsel anticipates concessions by the government related to specific offense characteristics pursuant to U.S.S.G § 2G2.1(b)(2)(A), as well as an amendment for one victim under U.S.S.G § 2G2.1(b)(1)(B).

Probation recommended a sentence below the advisory guidelines range. Counsel agrees that there are appropriate reasons for this Court to vary downward, and Samson respectfully requests that this Court vary downward from the advisory guideline range.

II.  Presentence Investigation Report

As noted in the presentence investigation report ("PSR"), the indictment alleged that the defendants pretended to be a young woman in social media accounts and sought to have teenage boys engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, in order that the defendants could then blackmail the victims by threating to send the images to others. The defendants also shared resources and methods to engage in these acts. ECF 77, PSR ¶ 3.

Tragically, on March 25, 2022, an investigation began after Victim 1 was found deceased at his father's home. ECF 77, PSR ¶13. The investigation noted a conversation Victim 1 had on Instagram with username "dani.robertts." with a collage of photographs of Victim 1. *Id.* ¶ 14. The search warrant return showed "dani.robertts." as a 19-year-old college student from Atlanta, Georgia. *Id.* ¶ 17. A review of the IP addresses showed the messages were coming from Lagos, Nigeria. *Id.* ¶ 19. The email account was first linked to Samuel Ogoshi. Samson Ogoshi was also found to be affiliated with the "dani.robertts." account through his Facebook

---

With the multiple count adjustment, counsel does not anticipate this would impact the total offense level as currently scored.

account, IP address, and email address. Id. ¶22. The investigation discovered that there were other victims of the extortion. ¶ 28.

Investigators traced the money that was sent from Victim 1 to a United States citizen. Johnathan Green received the $300 from Victim 1, and transferred a portion of those Apple funds into CashApp funds. Mr. Green then purchased bitcoin which was forwarded to Nigeria. *Id*. ¶ 21.

Francis Ekpe received the bitcoin from Mr. Jonathan Green. *Id*. ¶ 21. In fact, Mr. Epke "had an established group of money launderers living in the United States, and all launderers kept a portion of the payment for themselves (typically 20%) and forwarded the same to Mr. Ekpe."[4] *Id*. Mr. Ekpe then converted the U.S. currency and bitcoin into Naira (Nigerian currency) and kept a portion for himself, and then sent any remainder to the defendants. *Id*. ¶21. Mr. Ekpe worked with others who were involved with blackmailing. *Id*. ¶48. Ekpe has not been indicted.

Emmanuel Williams hacked and took over the Instagram accounts. *Id*. ¶24. Mr. Williams hacked the account later to be named "dani.robertts." and sold the account to Samuel Ogoshi for $4.80. *Id*. Mr. Williams has not been indicted.

Mr. Ezekiel was also involved in the extortion of Victim 1 with the defendants, but the United States has not pursued charges against him. *Id*. ¶ 28.

The Ogoshi brothers have been in custody for nearly 21 months. At the request of the FBI, on January 17, 2023, Samuel Ogoshi was arrested at college. On January

---

[4] Johnathon Green, Jarrell Williams, Dinsimore Robinson, Kendall London, Jr., and Brian Coldmon, Jr., have been indicted with a single count of Conspiracy to Commit Money Laundering of nearly $200,000. It is counsel's understanding that the government has not sought their detention and they remain out of custody on bond without an arraignment date. *United States v. Green, et al*, 2:24-cr-17.

24, 2023, Samson Ogoshi, with his father, voluntarily went to the Economic and Financial Crimes Commission (EFCC). *Id.* ¶11. Samson initially denied the use or affiliation with "dani.robertts.", but then later acknowledged he had been dishonest because he was nervous. *Id.* ¶40. At the request of the FBI, Samson was taken into custody and has remained in custody since January 24, 2023.

The Ogoshi brothers have continued to be cooperative with authorities. Samson was interviewed again by the EFCC two weeks later and provided written statements. Samson was also interviewed by the FBI. He detailed his involvement in the fraud. He described that Mr. Robert taught him how to do it, and the script he was given when texting with someone. Mr. Robert, Samuel, and Samson worked together and split their proceeds. *Id.* ¶42. Initially, both Samuel and Samson denied that Samson was involved in the conversation with Victim 1. *Id.* ¶35.

Mr. Robert was arrested and interviewed by EFCC, and also agreed to the common plan of the conspiracy. He admitted that after Victim 1 sent the money (or at least proof of the payment), it was Mr. Robert that continued to demand more money from Victim 1. After Victim 1 said he was going to commit suicide, Mr. Robert admitted that he continued to apply pressure and sent the photos to friends and family. *Id.* ¶46.

Only Samuel and Samson were extradited to the United States. On August 12, 2023, Samson arrived in the Western District of Michigan, and on August 14, 2023, an immigration detainer was placed on him. In February of 2024, Samson agreed to willingly speak with the government. On February 7, 2024, Samson began to share the information about the scheme wherein he detailed that co-conspirators

all worked together at the same time to complete the scheme. He detailed that hundreds of people his age were engaged in similar scams with and used the "blackmail script."

The meeting was stopped and reconvened on February 13, 2024. Samson admitted to his involvement with Victim 1. He confirmed that Mr. Robert was the person that encouraged Victim 1 to kill himself. The government required that Samson take a polygraph for him to continue the meeting. Samson then took and passed two polygraphs: one private and one with the FBI polygrapher.

After Samson and Samuel passed polygraphs, and fully cooperated, the theory of the government changed, and on April 10, 2024, pursuant to a plea agreement, Samson and Samuel pled guilty to count two. Both have remained in the custody of the USMS at the Newaygo County Jail. Samson has had no disciplinary problems.

III. Discussion and Motion for Downward Variance

A. **Introduction**

As the Court well knows, it is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). In determining the appropriate sentence, the Court is to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

5

18 U.S.C. § 3553 (a)(1)-(2). The Court is also instructed to consider:

> (3) the kinds of sentences available;
> (4) the kinds of sentences and the sentencing guidelines range for the offense;
> (5) any pertinent policy statement regarding the sentencing guidelines;
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and,
> (7) the need to provide restitution to any victims.

18 U.S.C. § 3553(a)(3)-(7).

There is no rule that requires "extraordinary" circumstances to justify a sentence outside guidelines range, because appellate courts are to review under an abuse-of-discretion standard, regardless of whether sentence is inside or outside guidelines range. *United States v. Gall*, 552 U.S. 38 (2007). There also is no requirement that, after concluding that a variance is warranted, the court must specify a new, adjusted sentencing range, and there is no requirement that the court distinguish adjustments on the basis of whether they are departures or variances. *United States v. Herrera-Zuniga*, 571 F.3d 568, 587 (6th Cir. 2009). It is solely the court's function to assess, weigh and resolve these factors.

### B. 3553(a) Factors

    (i)    Nature of Offense and Need to Reflect the Seriousness of the Offense and to Afford Adequate Deterrence

There is no doubt that Samson committed criminal acts that resulted in a devastating loss of life, and psychological injury for those victimized, and continued psychological injuries to their families. As Samson stated in his presentence interview, he feels deep regret and shame for his actions. *Id.* ¶81. He recognizes the intense harm that his actions had on all of the victims. He had no intention of

harming anyone. Samson has taken full responsibility for his actions and offers his most sincere apology to the victims and their families. Samson understands that he is facing a significant sentence.

With respect to general deterrence, news of Samson's arrest and his extradition went viral and has had a widespread effect in Nigeria. The proof that the United States will seek extradition and prosecute those that are involved in fraud with lengthy sentences has been made clear.

      (ii)      History and Characteristics of Samson Ogoshi

There is no excuse for what Samson did, but he and his family hope that this Court will see the totality of his life and will show him mercy. As noted in the PSR, a sentence below the guideline range may be appropriate due to Samson's age, variation from the typical sexual exploitation age, and the intentions of Samson.

While his understanding and acceptance of the consequences of his crime are without reservation, it is worth nothing that his background had a significant effect on his young adult life.

Age

Research has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward seeking behavior.[5] According to the proposed amendment to U.S.S.G. §5H1.1, "certain risk factors may affect a youthful individual to include environmental, adverse childhood experiences,

---

[5] See, e.g., U.S. SENT'G COMM'N, YOUTHFUL OFFENDERS IN THE FEDERAL SYSTEM 6–7 (2017); Daniel Romer et al., Beyond Stereotypes of Adolescent Risk Taking: Placing the Adolescent Brain in Developmental Context, 27 DEVELOPMENTAL COGNITIVE NEUROSCIENCE 19 (2017); Laurence Steinberg & Grace Icenogle, Using Developmental Science to Distinguish Adolescents and Adults Under the Law, 1 ANN. REV. DEVELOPMENTAL PSYCH. 21 (2019).

7

substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals are generally more impulsive, risk-seeking, and susceptible to outside influence. They are also more amenable to rehabilitation."

The indictment alleges a timeframe of sometime prior to February 2021 and at least May 2022. Samson would have been between the ages of 18-20 years old during that time. That means he was just a year or two older than many of the minor victims in this case. ¶ 65.

Samson is a tall, thin, soft-spoken young man. He will turn 22 in November and has spent the last 21 months in custody. He acknowledged that his actions were impulsive, fueled by use of controlled substances, as a way to earn "quick money."

He is away from his family for the first time. He is in a foreign country for the first time. He only sees his brother Samuel when they are transported to court. He has cooperated in the continued investigation and is prepared to continue to do so.

<u>Family History and Early Childhood</u>

Samson's father, Mr. Ogoshi Omame was enlisted into the Nigerian army on January 11, 1988. After his basic training, he was deployed to the Nigerian Army Intelligence Corp where he served as an intelligence officer. He was first posted to northeast Nigeria in Borno state, Maiduguri. He was later deployed for United Nations Missions in Dafur, Sudan. But for some time, he was posted to Lagos.

Samson was born in November 2002 to his parents Mr. Ogoshi and Mary Ojibo. He has two older brothers Samuel and Simeon. At the time he was born, the family resided in Lagos. His family is religious and attended church services, Sunday school, and Samson was in the church choir. He enjoys an extremely close bond with his

8

entire family. His father was often away from the family due to the military, but his educational and other needs were met. He felt safe and secure at the military barracks in Lagos.

When he was approximately eight years old, his father was transferred from Lagos to Borno State, Maiduguri in 2009. This period of time in Northern Nigeria was rampant with violence due to terrorist groups. Boko Haram was the world's deadliest terror group during the mid-2010s. It claimed responsibility for bombings and gun attacks. They killed Muslim and Christian clerics and worshippers, politicians, journalists, lawyers, police and military personnel as well as civilians. They claimed responsibility for attacks on churches, prisons, police stations, school buildings, newspaper offices, the UN, and on school buildings. Its intention was to overthrow the Nigerian government.[6] Human rights defenders and non-governmental organizations in Nigeria argued that the attacks in Borno State seriously damaged the state's education sector and undermined the right to education for thousands of children.[7]

Samon's family had moved right into the center of the terrorist activities. While the family lived inside the barracks, Samson's school was beyond the barrack's walls, and he was scared to go into the neighborhood.

In 2014, an extremely violent year, it is estimated that 4,000 people were killed in Boko Haram attacks. The UN estimated that over 1.5 million people were displaced, and at least three million were affected by the insurgency.[8]

---

[6] https://www.dni.gov/nctc/groups/boko_haram.html.
[7] https://www.amnesty.org/en/documents/AFR44/019/2013/en/
[8] https://www.gov.uk/government/case-studies/nigeria-boko-haram-and-the-fight-against-terrorism.

Samson was just 11 years old in 2014. In the early morning hours on March 14, 2014, Samson was dressed and ready for school. When he made it to the edge of the barracks, he was turned back as Boko Haram was brazenly attacking the military barracks. Samson made it home to be with his mother and brother Simeon, only to have the home besieged by bombs and gunfire. Ms. Ogoshi escaped with her two sons just before the family home was bombed and burned to the ground.

Samson recalled seeing dead bodies everywhere and that many of his friends were killed. Amnesty International reported that nearly 600 people were killed during the attack. Samson was extremely frightened, had nightmares, and difficulty sleeping.

The family lost everything. They had only the clothes on their backs after the deadly attack. They had to rely on church members to provide them shelter and depended on donations for clothes, food, and money. While still living in Borno State, another devastating blow came when the Boko Haram kidnaped over 270 schoolgirls in the area. The community was absolutely devastated. This was an incredibly difficult time and had a lasting impact on Samson and his family.

Eventually, the family moved back to Lagos. It took a very long time to recover both financially and emotionally from the attacks. At times they did not have sufficient clothing or housing. The family relied on their faith for courage and attended St. Paul's Military Church approximately three times per week.

Samson continued in school and graduated from secondary school and was accepted in Nasarawa State University. *Exhibit A*. *Exhibit B*. Samson wants to use his time wisely at the BOP to continue his education and to learn skills and trades

that he can use when he returns to Nigeria. He also wants to get drug treatment while at the BOP.

No one in the family has a criminal record. His father retired from the military after 35 years of service with no disciplinary record. His mother and brother are both employed. Samson's family continues to remain supportive of Samson and Samuel. *Exhibit C*. The family also wanted to express their sorrow to the victims and their families of this case. *Exhibit D*.

Intentions of Samson and Prevalence of Blackmail in Nigeria

In the relevant time period, Samson was just 18-19 years old. He had just completed secondary school, and had completed an apprenticeship with a shoe cobbler, but had no income.

In Lagos, and in other areas of Nigeria, the use of phones to scam others is extremely prevalent.[9] Samson's friend and classmate Mr. Robert was making "good" money by scamming and taught Samson how to do it in early 2022. Samson reported that hundreds of people just like him were involved in similar scamming. He was told who could get him a hacked account, how to make a fake profile, how to boost accounts, and, because English is not his first language, was given a script of what to say. The money was sent through an elaborate system both in the United States and in Nigeria to another person.

---

[9] R. Aborisdae, A. Ocheja, B. Okuneye (2024) Emotional and Financial Costs of Online Dating Scam: A phenomenological narrative of the experience of victims of Nigerian romance fraudsters. *Journal of Economic Criminology*, citing "Nigeria is reported to have the highest number of online romance fraudsters in Africa and ranks third in the World." (Walstad, 2021).

11

Samson mostly sought out information on university pages and young men that were in college, because he believed they would have money, but acknowledges the ages of the victims in this case. Samson worked with others during the scam and for the first time in his life, used controlled substances to stay awake to account for the time differences. With the little money he made, he bought a new phone and some clothes. He did not commit these crimes for a sexually gratifying purpose. Samson foolishly saw this as a quick way to make money and regrets he ever got involved. He realizes that he should have focused more on his apprenticeship and school. He acknowledges that his decision was impulsive and did not consider the long-lasting impact of his actions.

Full of remorse, during his presentence interview, Samson stated:

"someone died because of what I did. I think about his family and they might never heal. I know how my mom and dad feel about me being gone, but [Victim 1's] family won't see their child for the rest of their life…I know the crime is horrible. I am not the kind of person who wants someone to take his life. I have a lot of regret. In my conscience, I can never get over it."

Samson asks that these crimes be seen as a departure from his otherwise kind, faith-based, family-oriented and gentle character.

IV.     **Conclusion**

The defense respectfully requests that the Court take these matters into account in fashioning a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

Dated:  August 22, 2024

Respectfully Submitted,

WILLEY & CHAMBERLAIN LLP
Attorneys for Defendant Samson Ogoshi

*s/ Julia A. Kelly*

_____

Julia A. Kelly (P77407)

300 Ottawa Avenue, N.W., Suite 810
Grand Rapids, Michigan 49503-2314
(616) 458-2212
jak@willeychamberlain.com